# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **NICOLE WADE**,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>**MICHAEL SVOBODA**; **GEORGE BURKE**; and the **CITY OF LAKE OSWEGO**,<br><br>　　　　Defendants. | Case No. 3:24-cv-813-SI<br><br>**OPINION AND ORDER** |

Louren Oliveros, LOUREN OLIVEROS LAW LLC, 50 Charles Lindbergh Boulevard, Suite 205, Uniondale, NY 11553. Of Attorneys for Plaintiff.

Luke W. Reese, GARRETT HEMANN ROBERTSON PC, PO Box 749. Salem, OR 97308. Of Attorneys for Defendant Michael Svoboda.

Lauren E. Nweze and Amanda J. Rockett, WOOD SMITH HENNING & BERMAN LLP, 12755 SW 69th Avenue, Suite 100, Portland, OR 97223. Of Attorneys for Defendants Chief George Burke and City of Lake Oswego.

**Michael H. Simon, District Judge.**

Nicole Wade ("Wade") brings this lawsuit against three defendants: (1) Michael Svoboda ("Svoboda"), a former police officer with the Lake Oswego Police Department; (2) George Burke ("Burke"), currently the Chief of the Lake Oswego Police Department; and (3) the City of

PAGE 1 – OPINION AND ORDER

Lake Oswego, Oregon. The Court refers to Burke and the City of Lake Oswego collectively as the "City Defendants." Wade alleges that she and Svoboda engaged in a sexual relationship from 2019 to 2023. Wade asserts federal claims under 42 U.S.C. § 1983 ("§ 1983") against Svoboda alleging violations of her constitutional rights under the First, Fourth, and Fourteenth Amendments and asserts state law claims alleging intentional infliction of emotional distress and intentional spoliation of evidence. Against the City Defendants, Wade alleges that they contributed to Svoboda's violation of her constitutional rights and asserts a *Monell* liability claim under § 1983, as well as state law claims alleging negligent training, negligent supervision, and intentional spoliation of evidence.

Now before the Court are motions for summary judgment. Svoboda moves for summary judgment against all five claims asserted against him, and the City Defendants move for summary judgment against all claims asserted against them. For the reasons discussed below, the Court grants Svoboda's motion in part and the City Defendants' motion in full.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's

case.'" (quoting Celotex, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

From before Svoboda met Wade in April 2019 until his resignation in October 2023, Svoboda worked as a police officer for the Lake Oswego Police Department. ECF 69-12; ECF 73-6 at 18:10-11. George Burke became Police Chief of that department on September 9, 2022. ECF 68 ¶ 1.

Before the events giving rise to Wade's claims, the City Defendants were aware of an internal affairs investigation in February 2022 into Svoboda's conduct with women, including allegations that he approached a woman romantically while on duty. That investigation

concluded that the allegations against Svoboda were unsubstantiated. Based on that finding, Svoboda was not disciplined. ECF 82 ¶ 3.

Wade met Svoboda in April 2019 when Svoboda contacted her on the dating app, "Plenty of Fish." ECF 73-1 at 47:6-48:6. Svoboda's profile indicated that he was a police officer. *Id.* at 29:7-13. Before meeting Svoboda, Wade was a victim of domestic abuse and a mother. She exchanged private messages with Svoboda using the app and through text messages. *Id.* at 27:6-22, 21:3-4, 56:5-57:8. Shortly after their initial communication, Svoboda asked Wade if he could come to her apartment. *Id.* at 58:3-7. She assented and gave Svoboda her address, and the two then spent about an hour together. *Id.* at 59:8-61:3. During that time, Svoboda attempted to initiate a sexual interaction, but Wade said that she did not want to have sex. *Id.* at 66:1-10. She shared with Svoboda her history with domestic violence and explained that she was preparing to attend a hearing regarding the domestic violence that she had experienced by a former partner. Svoboda then told Wade that she needed somebody like him to protect her. *Id.* at 59:16-25.

Wade attended a plea hearing for her domestic abuser on April 15, 2019. *Id.* at 53:3. On the same night as that hearing, or early in the morning of April 16, 2019, Svoboda asked Wade to meet him for sex. *Id.* at 72:11-73:10. Wade agreed and met Svoboda in the parking lot of a business complex in Lake Oswego. Svoboda was on duty at the time and using his official police vehicle when this interaction occurred. Wade and Svoboda had outdoor sex, near their cars. Shortly after this encounter, Svoboda told Wade to delete their messages, to not tell or report to anyone what had happened, and to remain silent because both could get in trouble for what they had just done. *Id.* at 74:17-76:17. In 2023, Svoboda was investigated for this on-duty misconduct, pleaded guilty, resigned his position from the Lake Oswego Police Department, and is no longer eligible to work as a police officer. ECF 69-12.

PAGE 4 – OPINION AND ORDER

From April 2019 to April 2023, Wade and Svoboda intermittently continued their sexual relationship, although there were many periods during this time when the two did not interact or even communicate with each other. On several occasions, Svoboda used his personal phone to send Wade sexually explicit messages and photographs, using different social media and messaging platforms. Svoboda continued to tell Wade not to tell anyone about their sexual relationship, especially his on-duty misconduct. ECF 73-1 at 103:20-104:23.

On four separate occasions during this period, Svoboda indicated his knowledge of Wade's precise location, even though she had not shared that information with him. Svoboda did this by messaging Wade to ask her why she was in a specific location at that moment. During at least one of those occasions, Svoboda told Wade that she was "too close" to a police station. Wade found these texts to be unsettling and even threatening. ECF 73-7 at 2 (Interrogatory 17).

Wade and Svoboda had their final sexual encounter on April 9, 2023. ECF 73-1 at 150:3-151:17. After that, Wade learned that Svoboda had also attempted to initiate a similar relationship with one of Wade's friends. This discovery prompted Wade to report Svoboda's misconduct to the City Defendants on May 7, 2023. *Id.* 132:5-7. Shortly after making her report, Wade sent a message to Svoboda telling him that she had reported his misconduct to his employer, the Police Department. Not realizing that Wade had already made her report, Svoboda responded by sending Wade messages and videos pressuring Wade not to share any information about his on-duty misconduct or their relationship generally. Wade and Svoboda have not communicated since. *Id.* at 114:4-115:6.

Svoboda deleted the records of his communications with Wade and other women with whom he had communicated while on duty in an attempt to prevent his misconduct from being

PAGE 5 – OPINION AND ORDER

discovered. ECF 73-6 at 119:25-124:25. Svoboda also contacted Wade's friend to ask about what Wade had reported or was still reporting to his employer. *Id.* at 113:20-114:20.

Upon learning of the May 7, 2023 report from Wade, Police Chief Burke referred the matter to the Oregon City Police Department for investigation by that agency. ECF 82 ¶¶ 4-5. The City Defendants, however, did not immediately place Svoboda on leave or communicate to him that he was under investigation until several months after the investigation began. *Id.* ¶¶ 6-8. The Oregon City Police Department's investigation ultimately found Wade's allegations of Svoboda's on-duty misconduct to be accurate. ECF 69-12. As noted, Svoboda pleaded guilty and was convicted of official misconduct in the second degree, and he resigned from the Lake Oswego Police Department in October 2023. *Id.*

Wade filed a notice under the Oregon Tort Claims Act on September 29, 2023, and commenced this lawsuit on April 9, 2024, in the Circuit Court for Clackamas County. ECF 69-10. Defendants timely removed the action to federal court.

## DISCUSSION

### A. Svoboda's Motion for Summary Judgment

#### 1. First Amendment Retaliation

Svoboda argues that Wade fails to present sufficient admissible evidence to support a prima facie case under 42 U.S.C. § 1983 for violation of her First Amendment rights. First, Svoboda contends that because Wade did in fact report his misconduct Wade cannot show that her speech was chilled as a matter of law. Second, Svoboda contends that because the record contains no evidence that he ever intimidated or retaliated against Wade after she made her report, she cannot show retaliatory conduct by Svoboda. According to Svoboda, any request by him that she not report his misconduct motivated by his own desire for self-preservation and thus was thus not "retaliatory."

PAGE 6 – OPINION AND ORDER

"A plaintiff may bring a Section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights."[1] *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). To prevail on such a claim, "the plaintiff must show that (1) she engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct—*i.e.*, that there was a nexus between the defendant's actions and an intent to chill speech." *Id*. (cleaned up); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

Svoboda's argument that Wade's reporting of Svoboda's misconduct proves that her speech was not chilled fails because Svoboda mischaracterizes the applicable test under a First Amendment retaliation claim. As stated, the Ninth Circuit uses an objective "person of ordinary firmness" test to determine whether a defendant's conduct was chilling. *Ariz. Students' Ass'n*, 824 F.3d at 867; *see also Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009). Under this objective standard, it does not matter if an individual plaintiff ultimately manages to engage in further protected activity notwithstanding the chilling of that person's speech. *Capp v. Cnty of San Diego*, 940 F.3d 1046, 1054–55 (9th Cir. 2019); *see also Kando v. City of Long Beach*, 2023 WL 3092304, *1 (9th Cir. Apr. 26, 2023) (unpublished) ("It makes no difference that [the plaintiff] pressed forward and filed a complaint anyway."). Wade's claim of chilled speech, thus, does not fail merely because she reported Svoboda's misconduct. Telling Wade that she would "get in trouble" for participating in Svoboda's misconduct, ECF 73-1 at 76:11-17, and, as Wade

---

[1] The Court does not address any issue of qualified immunity because Svoboda did not make that argument in his motion for summary judgment, ECF 65.

PAGE 7 – OPINION AND ORDER

believed, that her child could be taken away from her, *id.* 78:4-8, are threats that could chill a person of ordinary firmness because they involve "severe consequences" affecting one's life. *See Capp,* 940 F.3d at 1055 ("The threat of losing custody of one's children is a severe consequence that would chill the average person from voicing criticism of official conduct. Accordingly, notwithstanding the fact that Capp himself was not chilled by Firth's conduct, we conclude that the alleged retaliation would objectively have had a chilling effect."). Thus, Wade presents a genuine issue of material fact regarding whether Svoboda's alleged statements and conduct had the potential to chill a person of ordinary firmness.[2]

Svoboda also argues that Wade's characterization of the relevant events shows that Svoboda did not engage in any intimidation or retaliation against Wade after she made her report on May 7, 2023. Thus, Svoboda contends, Wade cannot show retaliatory conduct after her constitutionally protected act of reporting Svoboda's misconduct. Again, Svoboda mischaracterizes Wade's claim. In response to Svoboda's motion, Wade states that the alleged retaliation consists of a series of acts by Svoboda, "all imposed because Plaintiff *attempted* to report his misconduct." ECF 72 at 39 (emphasis added). Wade frames the "constitutionally protected activity" that sparked Svoboda's alleged retaliation not as her *report* of Svoboda's conduct to his employer in May of 2023, but as her *threats* to report his misconduct throughout their relationship, dating back to the first on-duty interaction on April 15, 2019. *Id.* at 35.

---

[2] "Whether a person of ordinary firmness would be chilled by [the defendant's] action from engaging in future protected activity is a question of fact." *See Richardson v. City of Gladstone*, 2015 WL 569914, at *13 (D. Or. Feb. 10, 2015) (explaining that defendants' argument that their alleged conduct would not chill a person of ordinary firmness from exercising his free speech rights involved a question of fact which could not be resolved on motion to dismiss). "Because reasonable jurors could conclude that [the defendant's] actions … could chill the exercise of protected expression, [the court] erred in reaching a contrary conclusion on summary judgment." *Knotts v. Oregon Trail Sch. Dist. 46*, 2017 WL 4861521, at *7 (D. Or. Oct. 26, 2017).

The Ninth Circuit has concluded that there is "no legal distinction to be made between the filing of a charge which is clearly protected and threatening to file a charge." *Entler v. Gregoire*, 872 F.3d 1031, 1042 (9th Cir. 2017) (quoting *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 n.3 (9th Cir. 1982)); *see also Martin v. Her*, 2020 WL 4922490, at *12 (E.D. Cal. Aug. 21, 2020), *report and recommendation adopted*, 2021 WL 1210371 (E.D. Cal. Mar. 31, 2021) ("Accordingly, the undersigned finds that defendant is not entitled to summary judgment on the grounds that plaintiff did not drop his grievance because defendant's alleged threats would chill a person of ordinary firmness from future protected activities."). Wade contends that years' worth of retaliatory conduct by Svoboda came based on both her initial and later threats to report Svoboda to his employer. Svoboda's focus on potentially retaliatory conduct that occurred *after* Plaintiff's report on May 7, 2023, thus, is too narrow.

Correctly framed, Wade's allegations give rise to two disputes of material fact. First, the parties dispute whether Svoboda told Wade, beginning in April 2019, that Wade could get in trouble for having sex with him while he was on duty. Wade testified in her deposition that after first having sex with Svoboda in April 2019, "[h]e told me that it was something that we could both get in trouble for and he could lose his job and I was not allowed to tell anybody that this happened. He told me that I needed to delete the messages and never speak about this again." ECF 73-1 at 76:11-17. Later in her deposition, Wade reiterated what occurred: "I would tell him that I was going to report him because I didn't feel that was okay and I felt very uncomfortable, and that's when he told me no, not to, because he would lose his job and we would both get in trouble if anybody ever found out what we had done." *Id.* at 111: 7-12.

In his motion for summary judgment, Svoboda disputes Wade's characterization of what occurred. ECF 65 at 8; ECF 73-6 at 128:6-8, 16-19. What Svoboda told Wade about who could

PAGE 9 – OPINION AND ORDER

get in trouble for their conduct is material to a fact-finder's view of the retaliatory nature and chilling effect of Svoboda's conduct. Thus, a genuine dispute of material fact exists regarding Wade's First Amendment retaliation claim.

Second, the parties dispute whether Svoboda tracked Wade's location. Wade describes four separate instances in which, without telling Svoboda where she was or where she was going, Svoboda contacted Wade and stated that he knew her precise location and questioned why she was at that location. Further, on at least one of these occasions, Svoboda told Wade that she was "'too close to the police station." ECF 73-7 at 2 (Interrogatory 17). Also, on at least one of these times, Svoboda was on duty when he contacted Wade about her location. These instances occurred while Wade was in three separate locations in northwest Oregon. There was no discernible pattern to Wade's travel that Svoboda might have used to determine her location. Thus, Wade contends that circumstantial evidence shows that Svoboda must have used "resources at the police department" to aid his tracking.[3] *Id.*

Svoboda denies using police tracking equipment. ECF 73-6 at 252:15-22; ECF 72 at 43. This, however, is a genuine dispute of material fact to be resolved by the fact-finder at trial.

---

[3] Wade's circumstantial evidence is enough to survive summary judgment. "A plaintiff may establish motive using direct or circumstantial evidence." *Arizona Students' Ass'n*, 824 F.3d at 870 (citing *Ulrich v. City & Cnty of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002)). "Intent to inhibit speech, which is an element of the claim, can be demonstrated either through direct or circumstantial evidence." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999) (cleaned up) (citing *Mendocino Env't Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994); *see also Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1448 (9th Cir.1997) (circumstantial evidence of intent is sufficient to survive summary judgment motion)). "Where a plaintiff alleges discrete acts of police intimidation directed solely at silencing her, a civil rights claim will lie." *Mendocino Env't Ctr.*, 14 F.3d at 464 (cleaned up).

## 2.  Fourth Amendment Search and Seizure

Svoboda also moves for summary judgment against Wade's claim under the Fourth Amendment. He argues that no evidence shows that he tracked Wade or used police resources to track her. As discussed above, however, Wade has raised a genuine issue on this question.

"The Fourth Amendment provides in relevant part that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting U.S. CONST. amend. IV). "The touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *Id*. (citing *Smith v. Maryland,* 442 U.S. 735, 740 (1979)). The Supreme Court applied these Fourth Amendment principles to the use of location tracking devices in *United States v. Jones*, holding that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search,'" and therefore requires a warrant. 565 U.S. 400, 404 (2012). As noted, Wade presents sufficient evidence, albeit circumstantial, to create a genuine dispute of material fact regarding the elements of a Fourth Amendment violation. *Anderson*, 477 U.S. at 252, 255.

Further, in *Kyllo v. United States*, the Supreme Court held that an unreasonable search occurs when the government "uses a device that is not in general public use" to obtain information "that would previously have been unknowable without physical intrusion." 533 U.S. 27, 40 (2001). On summary judgment, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving

party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins.*, 210 F.3d at 1102. Thus, to defeat Wade's Fourth Amendment claim by summary judgment, Svoboda must show that no reasonable inference could be drawn in Wade's favor.

Here, the absence of any explanation as to how and why Svoboda was aware of Wade's location on the several instances that she describes allows for reasonable inferences to be drawn in favor of her allegation that Svoboda used police resources to track her. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1212 (9th Cir. 2008) (finding summary judgement for defendant improper because "no other explanation was given with respect to" the plaintiff's version of events); *see also Perez v. U.S. Postal Serv.*, 2014 WL 3925317, at *7 (W.D. Wash. Aug. 12, 2014) ("As Defendant has failed to offer an alternative explanation for these actions, Defendant has failed to carry its burden to show that summary judgment is warranted on these grounds."). Because Svoboda offers no explanation for how he knew where Wade was on the several instances she describes, summary judgment in favor of Svoboda on this point is unwarranted.

Svoboda also argues that the official investigation conducted by the Oregon City Police Department yielded no findings that any sort of technology had been used to track Wade's location and, therefore, there is a lack of sufficient evidence to support her claim under the Fourth Amendment. ECF 65 at 15; ECF 82 ¶ 13. The Oregon City Police Department's findings may support Svoboda's defense at trial, but they do not alter the Court's responsibility at this stage to view the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in that party's favor. *See Clicks Billiards*, 251 F.3d at 1257.

PAGE 12 – OPINION AND ORDER

### 3. Substantive Due Process

Svoboda also moves for summary judgment against Wade's Substantive Due Process claim, arguing that she was not exposed to any actual or particularized danger. Both parties cite the Ninth Circuit state-created danger standard expressed in *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 ("the state may be constitutionally required to protect a plaintiff that it 'affirmatively places . . . in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011))).

*Martinez* is a state-created danger case that, quoting *Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012), states that "by its very nature, the doctrine only applies in situations in which the plaintiff was directly harmed *by a third party*—a danger that, in every case, could be said to have 'already existed.'" *Martinez*, 943 F.3d at 1271 (quoting 678 F.3d at 1002). Svoboda argues that Wade cannot point to any interaction between the parties that would be sufficient to create a question of fact regarding any danger from a third party to which Svoboda exposed Wade. ECF 65 at 16. The Court agrees with Svoboda and grants summary judgment against Wade on this claim.

### 4. Intentional Infliction of Emotional Distress

Svoboda also asks the Court to find that Wade's claim for intentional infliction of emotional distress ("IIED") fails as a matter of law, for two alternative reasons. First, Svoboda argues that no actionable events occurred within the timeframe provided by the Oregon Tort Claims Act ("OTCA"). Second, and in the alternative, Svoboda argues that Wade cannot point to any extreme or outrageous conduct that could warrant the survival of her IIED claim.

### a. OTCA Notice[4]

Under the OTCA, an "action arising from any act or omission of a public body or an officer" may only be brought if the claimant gives proper notice to the officer's public employer "within 180 days after the alleged loss or injury." Or. Rev. Stat. ("ORS") § 30.275 (1)-(2). Wade filed her notice on September 29, 2023, with the intent to pursue IIED action against Svoboda for his conduct beginning in April of 2019. ECF 72 at 35, 50. Subtracting 180 days from the September 29 date of notice, the OTCA requires any alleged injury to have taken place on or after April 2, 2023. Wade asserts that because Svoboda's conduct over a four-year period of their relationship combines to form a "continuing tort" under Oregon law, all of Svoboda's alleged conduct during this period is properly alleged under the OTCA. *Id*. at 48-50. Even though only some of the alleged tortious conduct took place on or after April 2, 2023, this conduct acts as an anchor, Wade argues, for the rest of Svoboda's conduct that contributed to a post-April 2, 2023 emotional distress injury. *Id*. Svoboda disagrees, arguing that the alleged conduct does not constitute a continuing-tort under Oregon law. ECF 65 at 17-18. The Court agrees with Svoboda.

"[A]t the heart of the continuing tort idea is the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct." *Davis v. Bostick*, 282 Or. 667, 671-72 (1978); *see also Barrington ex rel. Barrington v. Sandberg*, 164 Or. App. 292, 296-98 (1999). In *Davis*, the plaintiff brought an IIED claim against her former husband for 10 incidents of physical and mental abuse under a continuing tort theory. Four of the

---

[4] Svoboda argues that Wade's tort-claim notice date bars some of his conduct from being considered by the Court under Wade's IIED claim. ECF 72 at 48. Wade, in turn, argues that her "tort-claim notice was timely filed because Officer Svoboda's conduct constituted a continuing tort." ECF 72 at 48. Wade also argues that "when a defendant engages in a continuing course of intentional, outrageous, distress-inducing conduct, the OTCA notice period does not begin to run until the conduct ends." *Id*. Svoboda and Wade agree that the OTCA notice period applies to her IIED claim against Svoboda.

ten incidents were outside the statutory period. The Oregon Supreme Court found each alleged incident to be "separately actionable" because each caused "harm" and did not reach "the level of actionability only at the end of the series" of misconduct or only due to the cumulative effect of the wrongful behavior. *Davis*, 282 Or. at 672; *see also Curzi v. Oregon State Lottery*, 286 Or. App. 254, 266, (2017). Conversely, in *Holdner v. Columbia County*, the court found that "negligent upkeep" of the defendant's property "and the resulting nuisance or trespass to plaintiff's land" constituted a continuing tort because the conduct could not be reasonably divided into discrete, individually actionable events. 51 Or. App. 605, 612-13 (1981).

Here, Wade's continuing-tort theory aligns more closely with that of *Davis* than that of *Holdner*. As in *Davis*, the evidentiary record describes an on-again-off-again sexual relationship that contained discrete events of sexual encounters and allegedly tortious conduct. ECF 73-1 at 105:17-107:7. Even with the cyclicality of the tortious conduct that Wade alleges, *id.* at 107:3-4, the alleged harm did not reach a requisite "level of actionability only at the end of the series"—or, more precisely, on or after April 2, 2023. *Davis*, 282 Or. at 672. At the very least, even if a continuing tort occurred during the parties' relationship, the events that allegedly occurred during the 180-day statutory period do not form any part of a continuing tort because the record describes discrete events—*e.g.*, conversations and sexual encounters—that are separated by attenuated periods of no contact. *See, e.g.*, ECF 73-1 at 105:17-107:7. Because the record shows distinct acts with distinct injuries, it is not true that the injuries caused by these events only reached a level of actionability after the beginning of the relevant OTCA notice date. As a result, only the alleged conduct that resulted in injury on or after April 2, 2023, can be considered under Wade's claim. *See Santos v. NaphCare, Inc.*, 2022 WL 828140, at *4 (D. Or. Feb. 4, 2022), *report and recommendation adopted*, 2022 WL 827194 (D. Or. Mar. 18, 2022)

("Thus, to the extent plaintiff alleges a separate cause of action for each of these incidents, those that fall outside the 180-day notice period are barred.")

### b. Extreme and Outrageous Conduct

Looking only at this temporally limited scope of alleged conduct, the Court does not find there to be a question for the jury on Wade's IIED claim. To prevail on an IIED claim under Oregon law, "a plaintiff must establish: (1) the defendant intended to inflict severe emotional distress, (2) the acts were the cause of plaintiff's severe emotional distress, and (3) the acts were sufficiently grievous to constitute a transgression of the bounds of socially tolerable conduct." *Dawson v. Entek Int'l*, 630 F.3d 928, 941 (9th Cir. 2011) (citing *Delaney v. Clifton*, 180 Or. App. 119, 129-30 (2002)). A court is empowered, on a motion for summary judgment, to "play[] a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *House v. Hicks*, 218 Or. App. 348, 358 (2008); *Pakos v. Clark*, 253 Or. 113, 132 (1969). Svoboda's alleged conduct—which includes the over-the-phone interaction with Wade after her report to Svoboda's employer and the deletion of evidence after Svoboda became aware of the internal investigation—does not rise to the level of extreme and outrageous conduct that the law requires. This conduct does not go "beyond the farthest reaches of socially tolerable behavior," because "[c]onduct that is merely rude, boorish, tyrannical, churlish and mean does not satisfy that standard, nor do insults, harsh or intimidating words, or rude behavior ordinarily result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or. App. 234, 239 (1992) (finding no IIED claim where employer threw a tantrum, screamed and yelled at his employees, accused them of being liars and saboteurs, then fired them all) (quotation marks and citations omitted). The conduct here may have been distressing, intimidating, and undoubtedly frustrating, but not so socially intolerable to

PAGE 16 – OPINION AND ORDER

suggest liability. *See Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1154 (D. Or. 2017) (granting summary judgment to defendant on plaintiff's IIED claim, finding harassment through letters and phone messages and attempting to use the threat of job loss to coerce plaintiff into marrying or completely dissociating from the father of her unborn child not sufficiently extreme and outrageous); *see also Relloque v. City of W. Linn*, 2025 WL 919443, at *11 (D. Or. Mar. 26, 2025). Thus, the Court finds no dispute of material fact and Svoboda is entitled to summary judgment against Wade's IIED claim.

### 5.  Intentional Spoliation of Evidence

Finally, Svoboda moves for summary judgment against Wade's stand-alone spoliation claim, arguing that spoliation is not an independent cause of action under state or federal law. One court in the District of Oregon has allowed an independent spoliation claim to go forward. *See McGuffin v. Dannels*, 2021 WL 4453106 (D. Or. Jul. 27, 2021), *report and recommendation adopted*, 2021 WL 4449975 (D. Or. Sept. 28, 2021). There, "the alleged spoliation [arose] from Defendants' destruction of evidence including potentially exculpatory videotapes" for which the Plaintiff also brought a § 1983 claim for destruction of evidence. *Id*. at *13. Those facts, however, are unique and not comparable to the facts of this case.

Indeed, in a subsequent opinion by the same court that adopted the report in *McGuffin*, the district court rejected a stand-alone spoliation claim. *Halsey v. Airbus Helicopters S.A.S.*, 2025 WL 318744 (D. Or. Jan. 28, 2025). The court explained that "*McGuffin*—the only Oregon case allowing a spoliation claim to proceed under Oregon law—is clearly distinguishable … because McGuffin's 'spoliation claim, unlike the claims in *Classen* and *Melo*, arises from the same nucleus of facts as the other underlying claims against Defendants.'" *Id*. at *7 n.7 (quoting *McGuffin*, 2021 WL 4453106, at *13, and citing *Classen v. Arete NW, LLC*, 254 Or. App. 216 (2012) (holding that spoliation claim was premature pending resolution of the underlying action)

and *Melo v. Oregon*, 2016 WL 297430 (D. Or. Jan. 20, 2016) (holding the same)). Another court in this district, after examining the case law, also held that "because plaintiff has not yet suffered any diminution in the value of his underlying claims, defendant's motion is granted as to plaintiff's spoliation claim." *Jones v. Target Corp.*, 2024 WL 1747326, at *6 (D. Or. Apr. 1, 2024), *report and recommendation adopted*, 2024 WL 1741117 (D. Or. Apr. 23, 2024); *see also Bliss v. Adewusi*, 2023 WL 6961979, at *14 (D. Or. Oct. 20, 2023). This principle is applicable here. Wade has not suffered any diminution in the value of her underlying claims. Additionally, no finding has yet been made on the grounds of sufficiency of evidence. Thus, Wade's fails to present a valid stand-alone claim of spoliation of evidence.

## B.  The City Defendants' Motion for Summary Judgment

Against the City Defendants, Wade asserts state law claims for negligent supervision, negligent training, and intentional spoliation of evidence and a federal claim under 42 U.S.C. § 1983 and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), alleging that the City Defendants maintained an unconstitutional custom, practice, or policy that resulted in the violation of Wade's constitutional rights. For the reasons explained below, the Court grants in full the motion for summary judgment filed by the City Defendants.

### 1.  Intentional Spoliation of Evidence

The City Defendants argue that Wade's intentional spoliation claim cannot be brought as a stand-alone cause of action. For the reasons explained above, Wade fails to present a stand-alone claim for intentional spoliation of evidence. She has not yet suffered any diminution in the value of her underlying claims. No finding has been made on the grounds of sufficiency of evidence. Thus, the City Defendants are entitled to summary judgment. *See Jones*, 2024 WL 1747326, at *6; *Bliss*, 2023 WL 6961979, at *14; *Halsey*, 2025 WL 318744, at *7 n.7; *Classen*, 254 Or. App. at 222; *Melo*, 2016 WL 297430, at *2.

PAGE 18 – OPINION AND ORDER

## 2. Negligent Training and Supervision

The City Defendants also move for summary judgment against Wade's state law negligence claims, arguing first that her claims are almost entirely barred by the OTCA notice requirement, and second that the non-time-barred conduct that remains took place outside of the course and scope of Svoboda's employment. The Court agrees.

Under Oregon law, to sustain a claim for negligent supervision a plaintiff must establish that the employer had knowledge of an employee's dangerous propensities. *See Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 507 (1994) (finding liability where the employer knew or should have known of the necessity of controlling the employee); *see also Carr v. US W. Direct Co.*, 98 Or. App. 30, 37 (1989) (finding that the employer could not have known that the employee was dangerous). The key issue is whether, based on what the employer knew or reasonably should have known about the employee, the employer could reasonably foresee that the employee, if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff. *See M.N.O. v. Magana*, 2006 WL 559214, at *20 (D. Or. Mar. 6, 2006) (citing *Washa v. Or. Dep't of Corrections*, 159 Or. App. 207, 225 (1999), *aff'd*, 335 Or. 403, (2003)). Importantly, for a claim alleging negligent supervision or negligent training, the harm or injury relevant to a notice requirement calculation is the harm that the employee inflicts upon the plaintiff. *See Washa*, 159 Or. App. at 225 (1999). As a result, determining what conduct is time-barred due to the OTCA 180-day notice requirement for Wade's state law negligence claims against the City Defendants involves the same analysis the Court undertook above regarding Wade's IIED claim against Svoboda. In short, Svoboda's conduct does not qualify as a continuing tort under Oregon law, and thus, only the alleged conduct that resulted in injury to Wade on or after April 2, 2023, may be considered under her state law tort claims. See *Davis*, 282 Or. at 671-72; *Barrington*, 164 Or. App. at 296-98; *Santos*, 2022 WL 828140, at *4.

Considering only the non-time-barred conduct, Wade provides no evidence to raise a genuine issue whether Svoboda was acting within the course and scope of his employment with City Defendants. Under an OTCA claim, "every public body is subject to civil action for its torts and those of its officers, employees and agents acting within the scope of their employment or duties." ORS § 30.265(1). For a negligent supervision and training claim brought against a public entity but premised on the injury-causing conduct of an individual public employee, as is the case here, it is "necessary to look to the acts that led to the injury to determine if *those* acts were within the [employee's] scope of employment." *Fearing v. Bucher*, 328 Or. 367, 373 n.4, 374 (1999) (applying respondeat superior doctrine to negligent supervision and training claims and finding that acts that were within the defendant's scope of employment resulted in the acts that caused injury to plaintiff) (emphasis in original).[5] To determine when an employee acts in the course and scope of their employment, Oregon courts look to three factors: (1) whether the act occurred substantially within the time and place limits authorized by the employment; (2) whether the employee was motivated, at least partially, by a purpose to serve the employer; and (3) whether the act is of a kind which the employee was hired to perform. *Chesterman v. Barmon*, 305 Or. 439, 442 (1988).[6]

---

[5] "Whether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled." *Fearing v. Bucher*, 328 Or. 367, 374 (1999) (citing *Stanfield v. Laccoarce*, 284 Or. 651, 655 (1978)).

[6] Wade argues that this Oregon standard should be adjusted given the position of trust in the community that a police officer holds. In support of this point, Wade cites to case law from outside of the relevant jurisdictions. ECF 77 at 44. Without evidence that Oregon courts have adopted this adjusted view, however, the Court declines to adopt Wade's suggestion.

The City Defendants argue that none of Svoboda's relevant conduct was motivated by a purpose to serve the City Defendants and that none of it was of the kind that Svoboda was hired to perform. The record shows the following:

- Svoboda and Wade texted about their final sexual encounter on April 9, 2023 in Svoboda's home, ECF 73-1 at 150:4-152:20; ECF 77 at 42;

- Svoboda asked and, indeed, pressured Wade by text message to retract her report dated May 7, 2023, to the city manager (including sending videos to Wade of his son crying because the report would cause Svoboda to lose his job), ECF 73-1 at 114:4-115:6;

- Svoboda blocked Wade's future communications and deleted their past communications from his phone, *id.*; ECF 73-6 at 207:7-13; and

- Svoboda contacted Wade's friend to ask if Wade was continuing to report information to the City Defendants, and if so, what she was reporting. ECF 73-6 at 113:22-115:7.

Wade identifies no evidence that *these* actions by Svoboda occurred while he was on duty, were motivated by an employment duty, or were at all related to his work as a police officer. No evidence suggests that these actions—those that may have contributed to a post-April 2, 2023 injury—were taken within the course and scope of Svoboda's employment with the City Defendants. Accordingly, the City Defendants are entitled to summary judgment against Wade's state tort claims.

### 3. Wade's *Monell* Claim

The City Defendants argue that they are entitled to summary judgment against Wade's *Monell* claim because it is time barred by the applicable statute of limitations for § 1983 claims

brought against Oregon public entities. In the alternative, the City Defendants argue that Wade's *Monell* claim fails because she cannot show that the City Defendants had an unconstitutional policy, practice, or custom. The Court addresses both arguments.[7]

First, the City Defendants argue that the applicable statute of limitations bars some of the allegations that Wade contends in support of her *Monell* claim. Wade alleges that Svoboda's "continuing conduct" connects the underlying constitutional violations to the statutory period, thereby delaying the accrual of her claims. The City Defendants argue that because the injuries that Wade allegedly suffered arose from a series of discrete acts, only those injuries that occurred within two years of the filing of this action may be considered for her *Monell* claim. To the extent that Wade is arguing a "continuing violation" theory to rebut the City Defendant's affirmative defense of the statute of limitations, the Court agrees with City Defendants.

For a *Monell* claim, the statute of limitations begins to accrue when a plaintiff knows or has reason to know of the underlying constitutional injury. *See TwoRivers v. Lewis*, 174 F.3d 987, 991-2 (9th Cir. 1999) (citing *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir. 1996)). The applicable statute of limitations for § 1983 claims brought against an Oregon public entity is two years. *See Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 579 (9th Cir. 2012) (applying Oregon's two-year statute of limitations for personal injury actions–outlined in ORS § 12.110–to § 1983 claims). Wade filed this action on April 9, 2024, which means that injuries leading to alleged *Monell* liability must have occurred on or after April 9, 2022. Although Wade contends

---

[7] The City Defendants also argue that Wade's *Monell* claim fails because Svoboda was not acting within the course and scope of his employment when he took the actions that Wade alleges led to her injuries. ECF 67 at 20-21. The Court rejects this argument because it mischaracterizes the difference between a *Monell* claim and a tort claim predicated on a theory of *respondeat superior*. *Monell*, 436 U.S. 658, 691 ("In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

that Svoboda's "continuing course of outrageous conduct" means that only some of that conduct must fall within the statutory period, the Ninth Circuit no longer recognizes the validity of such a theory for § 1983 claims. *See Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 747-48 (9th Cir. 2019) (explaining that the Ninth Circuit has "consistently refused to apply the [continuing violations doctrine] to rescue individualized claims that are otherwise time-barred"); *see also Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003) (rejecting the application of the continuing violations doctrine to § 1983 claims). Instead, the Ninth Circuit held in *Bird* that "'discrete ... acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges' because '[e]ach discrete ... act starts a new clock for filing charges alleging that act.'" 935 F.3d at 747 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). When a series of discrete acts is cited as evidence of a violation of one's constitutional rights, only those acts that occurred within the statutory period survive. *See, e.g.*, *Evans v. Nelson*, 2022 WL 20335877, at *10 (D. Or., 2022) ("Claim 11 is barred as to these Defendants. However, Claim 11 survives as to allegations based on events occurring on or after August 5, 2017.").

Here, Svoboda's alleged violations of Wade's constitutional rights stem from discrete events and actions. The allegations of threats or instructions that Svoboda directed at Wade and his alleged tracking of her location, for example, come from discrete interactions between Svoboda and Wade throughout their on-again-off-again relationship. As a result, only those injuries suffered by Wade caused by Svoboda's alleged violation of constitutional rights can provide a basis for her *Monell* claim.[8]

---

[8] A recent Ninth Circuit case held that the statute of limitations for a § 1983 claim may be tolled when the plaintiff alleges sufficient evidence of a delayed realization of her injuries based on a power imbalance between the plaintiff and the alleged perpetrator. *St. Clair v. County of*

Next, the City Defendants argue that no matter how Wade frames her custom, practice, or policy claim that the City Defendants allegedly adopted, the evidence in the record cannot support a finding of deliberate indifference by the City Defendants. To impose municipal liability under § 1983 for a violation of constitutional rights based on a policy, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that the policy amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. #40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Wade argues that the City Defendants failed to prevent foreseeable constitutional harm by failing to properly train and discipline Svoboda. These omissions by the City Defendants, according to Wade, amount to a "failure to investigate and discipline employees in the face of widespread constitutional violations," demonstrating a deliberate indifference to a plaintiff's constitutional rights. ECF 77 at 52; *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011); *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018)

---

*Okanogan*, 154 F.4th 1154, 1159-60 (9th Cir. 2025). In that case, the court held that, at least for purposes of responding to a motion to dismiss, the plaintiff sufficiently alleged that she "did not understand the nature of the harm until long after the sexual encounters" "due to her age, addiction, and the coercion." *Id.* The court explained that even if the plaintiff was aware of the power imbalance from the very beginning, that awareness is wholly different from the awareness that "such authority is being wielded inappropriately." *Id.* In the pending case, however, even though Wade's relationship with Svoboda may have reflected a power imbalance, she does not sufficiently allege or present facts showing that she was unaware of her constitutional injuries until a time within the statutory period. In fact, a key premise of Wade's constitutional claims against Svoboda is her allegation that Svoboda told her as early as April of 2019 that both Svoboda and Wade could get in trouble for the conduct that they engaged in. ECF 73-1 at 74:17-76:17. Neither the factual record nor Wade's allegations support a finding that she "did not understand the nature of the harm until long after" April 9, 2022. *Id.* Further, even if tolling were allowed in this case and all of Svoboda's conduct toward Wade were considered, the Court's analysis of the merits of Wade's deliberate indifference *Monell* claim would remain unchanged.

(recognizing liability through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations"). The City Defendants argue that not only did Svoboda's conduct not amount to "widespread constitutional violations," but even if it did, the City Defendants properly disciplined Svoboda after they became aware of the full extent of his misconduct. Thus, argue the City Defendants, the facts viewed in the light most favorable to Wade do not show a genuine issue for trial on deliberate indifference to constitutional rights. ECF 67 at 27-28.

The Court agrees that the facts do not show widespread constitutional violations. In *Davis v. City of Ellensburg*, the Ninth Circuit affirmed summary judgment entered for the municipal defendants in that case on a *Monell* deliberate indifference claim and explained that "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." 869 F.2d 1230, 1233 (9th Cir. 1989). "Municipalities cannot be held liable simply because they employ a tortfeasor," the court explained, because "[a] jury finding of liability based solely on a police officer's isolated misbehavior would unduly threaten a municipality with respondeat superior liability." *Id*. at 1234 (citing *Monell*, 436 U.S. at 691 and *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985) (Brennan, J., concurring)). Similarly, the Supreme Court held in *Connick v. Thompson* that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." 563 U.S. 51, 62 (2011). The Court explained that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Here, Svoboda's misconduct, while comprised of multiple discrete acts across multiple years, aligns more closely

PAGE 25 – OPINION AND ORDER

with the "isolated misbehavior" of the single officer in *Davis* rather than the "widespread" constitutional violations that Wade claims the facts show. Even viewing the facts in the light most favorable to Wade, the conduct alleged does not amount to the widespread constitutional violations that *Monell* requires.

Second, even if the facts suggested that constitutional violations were sufficiently widespread, the response by the City Defendants does not amount to a failure to investigate and discipline. In *Gillette v. Delmore*, the Ninth Circuit held that a § 1983 plaintiff failed to demonstrate a municipal custom or practice because he failed to produce "evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." 979 F.2d 1342, 1349 (9th Cir. 1992). The same is true here. The evidence presented, even when viewed in the light most favorable to Wade, shows that the City Defendants referred Wade's May 7, 2023 report to the Oregon City Police Department for an external criminal investigation of Svoboda's conduct. That process led to Svoboda's conviction for official misconduct in the second degree, his resignation from the Lake Oswego Police Department, and his surrendering of his police certification credentials. After Wade alerted the City Defendants to the conduct that gives rise to her alleged constitutional injuries, the City Defendants initiated the investigation of Svoboda, who was then disciplined. Thus, Wade's *Monell* claim against the City Defendants fails to present a genuine dispute of material fact.[9]

---

[9] *St. Clair v. County of Okanogan* also illustrates this point. 154 F.4th 1154 (9th Cir. 2025). The Ninth Circuit reversed a district court's dismissal of the plaintiff's *Monell* claim in that case because the plaintiff alleged that the county defendant knew not just of the individual county employee's repeated misconduct, but also of similar misconduct by three other deputies and of an audit that identified deficient policies, practices, and complaint tracking that was "downplayed and … not acted upon." *Id.* at 1161. The court concluded that "[t]hese additional facts provide a basis for a plausible *Monell* claim" at the motion to dismiss stage. *Id*. The same cannot be said for the facts here.

PAGE 26 – OPINION AND ORDER

**CONCLUSION**

The Court GRANTS IN PART and DENIES IN PART Michael Svoboda's motion for summary judgment, ECF 65. The Court grants summary judgment to Michael Svoboda on Count One (alleging intentional infliction of emotional distress), Count Four (alleging intentional spoliation of evidence), and Count Eight (alleging violation of Substantive Due Process). The Court denies summary judgment to Michael Svoboda on Count Five (alleging violation of First Amendment rights) and Count Six (alleging violation of Fourth Amendment rights), The Court GRANTS full summary judgment to the City of Lake Oswego and George Burke, ECF 67. Thus, all that remains for trial are Plaintiff's claims against Michael Svoboda on Claims Five and Six. Counsel for Plaintiff and Michael Svoboda are directed jointly to contact the Courtroom Deputy to set a telephone conference for the purpose of scheduling trial.

**IT IS SO ORDERED**.

DATED this 6th day of May, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

PAGE 27 – OPINION AND ORDER